Deborah RICE–LAMAR, Plaintiff,

v.

CITY OF FORT LAUDERDALE, et al., Defendants.

No. 97–7007–CIV.

United States District Court, S.D. Florida.

Nov. 25, 1998.

Joel Hirschhorn, Joel Hirschhorn, P.A., Coral Gables, FL, Reginald John Clyne, Simmons & Clyne, Coral Gables, FL, for plaintiff.

Carmen Sirkin Johnson, Kelly Cheary, Muller Mintz Kornreich Caldwell Casey Crosland & Bramnick, Miami, FL, for defendants.

### ORDER GRANTING FINAL SUMMARY JUDGMENT FOR DEFENDANTS

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon the following motions:

1.   Defendant John Panoch's Motion for Summary Judgment [DE 135];

2.   Defendant Bruce Larkin's Motion for Summary Judgment [DE 137];

3.   Defendant Pete Witschen's Motion for Summary Judgment [DE 139];

4.   Defendant George Hanbury's Motion for Summary Judgment [DE 141]; and

5.   The Defendant City of Fort Lauderdale's Motion for Summary Judgment [DE 143].

The Court has carefully considered the motions and is otherwise fully advised in the premises.

## I.   BACKGROUND

The plaintiff, Deborah Rice–Lamar ("Lamar"), an African–American female, brought the present action pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991 ("Title VII"), and 42 U.S.C. §§ 1981, 1983 and 1985(3) against her former employer, the City of Fort Lauderdale ("the City"), and against her former supervisors, George Hanbury ("Hanbury"), the City Manager, Pete Witschen ("Witschen"), the Assistant City Manager, Bruce Larkin ("Larkin"), the Director of Administrative Services, and John Panoch ("Panoch"), the Director of Personnel, in their individual capacities (collectively referred to as the individual defendants). Lamar had worked for the City as its Affirmative Action Specialist from June 20, 1988 until her employment was terminated on October 21, 1996. In her twelve count Second Amended Complaint, Lamar has asserted the following claims:  (1) violation of Title VII by the City (Count I);  (2) violation of 42 U.S.C. § 1983 by all of the defendants (Counts II through VI);  (3) violation of 42 U.S.C. § 1985(3) by all of the defendants (Count VII);  and violation of 42 U.S.C. § 1981 by all of the defendants (Counts VIII through XII).   The

essence of Lamar's complaint is that she was retaliated against for exercising her freedom of speech rights and she was discriminated against based upon her race and gender.

## II. FACTS

The Court notes that the material facts are not in dispute.[1] Specifically, prior to January 1995, Lamar had never been the subject of any disciplinary action and had always received above average performance evaluations. Sometime during 1995, Lamar prepared the City's official 1995 Affirmative Action Report (hereinafter "Affirmative Action Report" or "Report") which indicated that the City needed to take a new direction to end the systemic discrimination within the City government. The Report contained Lamar's own personal commentary and conclusions, which Lamar honestly believed accurately reflected the situation at the City. Lamar, however, alleges her supervisors told to her to only publish the statistical numbers, which she claimed hid the City's discriminatory practices.

On January 19, 1995, Lamar received a Written Reprimand from Panoch for, inter alia: (1) failure to complete the 1995 Affirmative Action Report by the due date of December 2, 1994; and (2) failure to complete the Minority/Women's Business Enterprise Directory (hereinafter "MBE/WBE Directory") for the City Commission which was due December 22, 1994. Lamar later received a one-day suspension for failure to meet the January 31, 1995 deadlines for completing the 1995 Affirmative Action Report. Lamar did not appeal this disciplinary action to the City's autonomous Personnel (Civil Service) Board.

Lamar again failed to produce the 1995 Affirmative Action Report by the revised deadlines of March 1995. A five day suspension was recommended. Lamar appealed the recommendation, and the suspension was reduced to four days for records purposes only. Lamar did not further appeal this disciplinary action.

In February 1996, a City employee shot several co-workers and also committed suicide. The employee left a suicide note that allegedly stated his attack was to punish his former co-workers for the unfair and racist treatment that he received. As a result of the shootings, the City hired Crisis Management International, Inc. ("CMI") to provide psychological services. During this time period, various meetings were held related to the shooting incident. Lamar was excluded from these meetings. At times, however, Lamar would invite herself to the crisis management meetings. Lamar was eventually told that it would be insubordination for her to speak to anyone without first directing her statements through Panoch and Larkin, her immediate supervisors.

On June 19, 1996, Lamar presented the 1996 Affirmative Action Report, which she had prepared, to the department head meeting. As with the 1995 Report, Lamar included her own commentary and conclusions in the Report which she honestly believed to be the truth. In particular, the "narrative section of this first draft plainly stated that 'we are still a City plagued with racism, glass ceilings for women and brick walls for people of color, a tolerance for the perceptions of unfairness and a proverbial silence about it all.'" Plaintiff's Opposition Brief [DE 159 at 4] (quoting Excerpt First Draft of 1996 Affirmative Action Report, Plaintiff's Appendix, Exhibit M [DE 68]). Lamar alleges that senior management was not receptive to the report and that each of the named individual defendants requested that she make various substantive changes to the report. Lamar refused to make the changes.

On July 22, 1996, Lamar left her own revised copy of the 1996 Report in the

---

1. The Court has taken the material facts from the Plaintiff's own version of the facts contained in her opposition briefs and from the undisputed facts contained in the Joint Pretrial Stipulation.

offices of Larkin and Panoch for review with the message that it was ready for printing and distribution. On July 26, 1996, Larkin met with Lamar and offered her the opportunity to resign. On July 29, 1996, Lamar distributed her own revised version of the 1996 Affirmative Action Report, without being reviewed, to City Manager Hanbury and all but one of the other department heads. On July 29, 1996, Lamar also distributed the MBE/WBE Directory.

On August 5, 1996, Lamar responded to Larkin's request for her resignation, blaming the delay in producing the required reports on computer problems and also claiming that Larkin and Panoch were harassing her in an attempt to have her suppress her affirmative action analysis in her reports. On August 11, 1996, Lamar was notified of possible disciplinary action based, inter alia, upon the delinquent MBE/WBE Directory and the unauthorized distribution of the directory and revised 1996 Affirmative Action Report. The City Manager eventually approved Lamar's discipline which was to dismiss her effective October 21, 1996.

The crux of Lamar's complaint is that she was reprimanded, suspended and discharged allegedly due to her opinions and due to her race and gender. Lamar's principal argument is that her "attempt to publish her report was a substantial motivating factor in her discharge, as the timing of her discharge and immediate expulsion from the City showed that her superiors want to squelch her from communicating her opinions further." Opposition Brief [DE 159 at 5–6].

### III. DISCUSSION

The defendants have filed the present motions for summary judgment asserting the following arguments: (1) Lamar's speech was not protected by the First Amendment; (2) Lamar cannot establish a prima facie case of discrimination and cannot establish that the City's legitimate, non-discriminatory reasons for its actions were pretextual; and (3) the individual defendants are entitled to qualified immunity. The Court will address each of the defendant's arguments in turn.

### A. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and any doubts in this regard should be resolved against the moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but

instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202.

## B. *First Amendment Claim*

■■■■ It is settled law that a state entity may not discharge a public employee in retaliation for speech protected under the First Amendment; however, a public employee's right to freedom of speech is not absolute. *Martinez v. City of Opa–Locka,* 971 F.2d 708, 712 (11th Cir.1992); *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989) (citations omitted); *see also Martin v. Baugh,* 141 F.3d 1417, 1420 (11th Cir.1998), *reh'g denied,* 156 F.3d 188 (1998) (Table). To prevail because of a dismissal in retaliation for the exercise of free speech, pursuant to the test set forth by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and refined in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), a plaintiff must establish that (1) the expression addressed a matter of public concern; (2) the employee's First Amendment interests outweigh the interests of the employer in preserving the efficiency of government services; and (3) the employer's conduct was a substantial or motivating factor in the government's discharge decision. *Martinez,* 971 F.2d at 712. The first two prongs are legal determinations for the

court. *Id.; see also Martin,* 141 F.3d at 1420. Once the plaintiff establishes the first three prongs, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have reached the same decision to terminate the plaintiff's employment "even in the absence of the protected conduct." *Bryson,* 888 F.2d at 1566 (quoting *Mt. Healthy City School Dist. Board of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Here, the Court finds that while Lamar has met the first prong, she has failed to establish the second prong.

### 1. *Lamar's expression did address matters of public concern*

■■■■ In the present case, Lamar's alleged protected speech was her claim that the City was systemically discriminating against its minority and women employees. The Court notes that generally speech regarding discrimination addresses a matter of public concern. *See Connick,* 461 U.S. at 149 n. 8, 103 S.Ct. 1684 (1983). However, the Court's inquiry does not end here. This Circuit instructs that when an employee is speaking about discrimination regarding her own public employer, the Court must conduct further analysis as follows:

> First Amendment protection remains unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest...." [*Connick,* 461 U.S.] at 147, 103 S.Ct. at 1690. A court must therefore discern the purpose of the employee's speech—that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee. *Id.* at 146, 103 S.Ct. at 1690; *Kurtz,* 855 F.2d at 730; *Ferrara,* 781 F.2d at 1515–16. To accomplish this, a court considers "the content, form and context of a given statement, as revealed by the whole record." *Deremo v. Watkins,* 939 F.2d 908, 910 (11th Cir. 1991) (citing *Connick,* 461 U.S. at 147–

48, 103 S.Ct. at 1690). A court may consider the employee's attempts to make the concerns public, [FN5] along with "the employee's motivation in speaking." *Id.* at 911 (citations omitted).

While we heartily agree with Morgan that sexual harassment in the workplace is a matter of important social interest, " 'the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.' " *Kurtz,* 855 F.2d at 727 (quoting *Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)). Rather, we must determine whether the purpose of Morgan's speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other. *See Deremo,* 939 F.2d at 912 (employees' request for compensation for remaining silent about sexual harassment did not constitute a matter of public concern); *Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987) (employee's private complaints of sexual harassment were not matter of public concern); *see also Marshall v. Allen,* 984 F.2d 787, 796 (7th Cir.1993) (male co-worker's verbal support for victims of sexual harassment constituted speech touching upon a public concern). *Morgan v. Ford,* 6 F.3d 750, 754–55 (11th Cir.1993), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994).

In the present case, the City argues that Lamar was acting as an employee, and therefore, her speech was not of a matter of public concern. Lamar responds that she was acting as a citizen and not as an employee, and therefore, her speech was of a matter of public concern.

■ The allegations of protected activity relate to Lamar's attempt to be a part of the crisis management meetings and to publish the Affirmative Action Reports that she prepared. It is undisputed that the crisis management meetings were internal meetings within the City. It is also undisputed that Lamar prepared the Affirmative Action Reports as an employee of the City and not as a citizen. However, contrary to the City's arguments, Lamar's speech was not in furtherance of her own private interests. Rather, Lamar's concerns were of discrimination that affected others and certainly were intended principally to raise issues of public concern. The Court also notes that the cases cited by the City are all distinguishable because they involved cases where the plaintiffs were principally concerned with discrimination against themselves. Therefore, the Court finds that Lamar has met the first prong.

2. *City's interests in preserving the efficiency of government services outweighed Lamar's interests.*

■ In weighing the competing interests of Lamar and the City, several factors must be considered including: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Martinez,* 971 F.2d at 712 (citing *Bryson,* 888 F.2d at 1567). In examining these facts, the Court must also take into account Lamar's position with the City and her job responsibilities.

[I]n weighing the State's interest in [disciplining] an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where ... an employee serves no confidential, policy-making, or public contact role, the danger to the agency's successful functioning from that employee's private speech

is minimal. *Id.* at 390–91, 107 S.Ct. at 2900. Conversely, when the employee serves in a sensitive capacity that requires extensive public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning.

*Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1237 (11th Cir.1992) (quoting *Rankin v. McPherson,* 483 U.S. 378, 390–391, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

■ In the present case, Lamar's position with the City was as its Affirmative Action Specialist, which involved coordinating and implementing the City's affirmative action/equal opportunity and workforce diversity programs. Lamar's position also required significant contact with the community. Lamar was certainly in a position to obtain knowledge about whether there was systemic discriminatory hiring and promotion practices in the City. Moreover, the Court notes that Lamar may very well be correct that the citizens of the City were entitled to know about her opinion that systemic discrimination was widespread within the City government. However, the manner in which she chose to make her views known was certainly disruptive.

As noted previously, the allegations of protected activity relate to Lamar's attempt to be a part of the crisis management meetings and to publish the Affirmative Action Reports that she prepared. It is undisputed that the crisis management meetings were internal meetings within the City. It is also undisputed that Lamar prepared the Affirmative Action Reports as an employee of the City and that the Reports were the City's formal documents.

Contrary to Lamar's assertions, the City did not believe that Lamar was entitled to have her own personal views contained in the City's own formal document. The Affirmative Action Report, while initially prepared by Lamar, was the City's report. Lamar's supervisors specifically requested that she make changes to the report. At that point, Lamar had two choices. First,

she could make the changes against her will and seek an alternative means for espousing her own personal views. Alternatively, Lamar could refuse to make the changes and suffer the consequences, including charges of insubordination. It is undisputed that Lamar chose the latter, and consequently, it is undisputed that Lamar's actions constituted insubordination. *See, e.g., Hankard v. Town of Avon,* 126 F.3d 418, 422 (2d Cir.1997) ("Specifically, the First Amendment's shield does not extend to speech and conduct closely connected with insubordination 'that impedes an employee's performance of his duties or that interferes with the proper functioning of the workplace.' ") (citations omitted).

Returning to the factors listed above, while Lamar may have had entirely good intentions in refusing to make the changes to the Report, her good intentions do not negate the fact that her actions impeded the City's ability to perform its duties efficiently. The Court also notes that the manner, time and place of Lamar's alleged protected speech weigh against her. The Court finds that Lamar's complaints all involve her internal disagreements with her supervisors regarding the extent of the alleged discrimination within the City and how to deal with such alleged discrimination. The Court notes that "the purpose of the 'public concern' threshold test is to prevent the federal courts from becoming a 'roundtable for employee complaints over internal office affairs.' " *Kurtz v. Vickrey,* 855 F.2d 723, 727 (11th Cir.1988) (quoting *Connick,* 461 U.S. at 149, 103 S.Ct. 1684). Finally, the Court notes that the context within which Lamar's speech was made, within the City's own formal document, also weighs against Lamar. While Lamar may have had a First Amendment right to make her opinions on racial discrimination known to the public, she was not entitled to do so in a report prepared for the City that would also represent the City's own position. Therefore, the Court holds that the City's interest in preserving the efficiency of its operations outweighed La-

mar's First Amendment interests. *See also Hamm v. Members of Board of Regents,* 708 F.2d 647, 653 (11th Cir.1983) (affirming district court's judgment against employee, whose job was to aid and assist her superior in resolving problems of discrimination "who persisted in 'going public' rather than first going through her supervisor, the person with the ultimate decision-making authority").[2]

### C. *Discrimination Claims*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Discrimination is also unlawful under 42 U.S.C. § 1983, where the employer is also acting under color of state law. The Court notes that the elements of a Title VII claim and a section 1983 claim for discrimination are the same.[3]

A plaintiff may establish a prima facie case of discrimination either by "statistical proof of a pattern of discrimination," or "direct evidence of discrimination, which consists of 'evidence which, if believed, would prove the existence of discrimination without inference or presumption,' " or by "circumstantial evidence to prove discriminatory intent, using the framework estab-

lished in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)." *Holifield v. Reno,* 115 F.3d 1555, 1561–62 (11th Cir.1997) (citations omitted). In the usual case, direct evidence is not present and the plaintiff must rely on circumstantial evidence. *Id.* at 1562.

Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) the plaintiff belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees of other races more favorably; and (4) he was qualified to do the job. *Holifield,* 115 F.3d at 1562; *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1310 (11th Cir.1998). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield,* 115 F.3d at 1562 (citations omitted).

If a prima facie case is shown, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *Jones,* 137 F.3d at 1311. If this is done, then the plaintiff may attempt to show that the proffered

**2.** Lamar relies heavily on the case *Cromer v. Brown,* 88 F.3d 1315 (4th Cir.1996), wherein the plaintiff, an African–American and former deputy sheriff, brought an action against the sheriff's office and the sheriff himself. Cromer asserted claims of racial discrimination and retaliation for exercising his first amendment rights after he was allegedly discharged for endorsing a letter written by the black officer's association and sent to the sheriff raising specific charges of racial discrimination. However, the *Cromer* case is clearly distinguishable from the present case, because here, unlike *Cromer,* Lamar seeks to express her views in her employer's own document being sent to others as opposed to a document being sent from others to her employer, the City.

**3.** The Eleventh Circuit has held that Section 1983 may be used as a parallel remedy for

gender or race discrimination which violates the equal protection clause of the Fourteenth Amendment. The elements of such a claim are the same as the elements of a Title VII action. *Cross v. State of Alabama,* 49 F.3d 1490, 1507–08 (11th Cir.1995) (citing *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982)). Moreover, the Court's analysis applies equally to Lamar's claims under 42 U.S.C. § 1981, *see Peterson v. BMI Refractories,* 132 F.3d 1405, 1412 n. 13 (11th Cir. 1998) (noting that this Circuit has held that the elements of a disparate treatment claim under section 1981 and Title VII are identical) and 42 U.S.C. § 1985(3). *See Johnson v. City of Fort Lauderdale,* 126 F.3d 1372, 1379 (noting section 1985(3) narrow discriminatory intent element imposes a significant hurdle for plaintiffs).

reason was merely a pretext for the defendant's acts. *Id.* at 1311; *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.*

■ Turning to the present action, the Court finds that there are genuine issues of material facts with respect to whether Lamar has established her prima facie case. However, the Court finds that there are no genuine issues of material facts as to whether the City's stated legitimate, nondiscriminatory reasons for its actions were pretextual. As discussed above, it is undisputed that Lamar was disciplined for refusing to follow her supervisors' instructions. Although the subject matter of the dispute between Lamar and her supervisors involved race and gender discrimination, the City's actions with respect to Lamar herself were not due to her race or gender.[4] Rather, they were due to her insistence on including her own conclusions in the Affirmative Action Reports against her supervisors' wishes. *See, e.g., Hamm v. Members of Board of Regents,* 708 F.2d 647, 653 (11th Cir.1983) (affirming district court's judgment against employee, whose job was to aid and assist her superior in resolving problems of discrimination "who persisted in 'going public' rather than first going through her supervisor, the person with the ultimate decision-making authority"). Therefore, the City is entitled to summary judgment as to Lamar's discrimination claims.

### D. *Qualified Immunity*

■ Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In addressing claims of qualified immunity, the Eleventh Circuit applies the following two-part analysis: "First, the defendant government official must prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. If the defendant meets this burden, the plaintiff must then demonstrate that the defendant violated clearly established law based upon objective standards." *Evans,* 117 F.3d at 1320 (citing *Hartsfield v. Lemacks,* 50 F.3d 950, 953 (11th Cir.1995)). "In order to meet this burden, the plaintiff must demonstrate that the contours of his right were sufficiently clear so that reasonable officers would have understood that their actions violated his rights." *Evans,* 117 F.3d at 1320 (citing *Swint v. City of Wadley,* 51 F.3d 988, 995 (11th Cir.1995) and *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . ., but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (internal citation omitted); *see also Moniz v. City of Fort Lauderdale,* 145 F.3d 1278 (11th Cir.1998).

Turning to the present case, it is clear that the individual defendants were acting within the scope of their employment. Further, the Court finds that the unlawfulness of the individual defendants' actions were not apparent as they were disciplin-

---

4. Lamar discusses numerous instances where the City allegedly discriminated against other employees. While these other employees may have an action against the City, these instances do not support the allegations that the City discriminated against Lamar because of her race or gender.

ing an employee for what they perceived to be insubordination.

■ Turning first to the First Amendment claims, the Court finds that even if genuine issues of material facts had existed as to whether the City is entitled to summary judgment, under the less stringent standard for qualified immunity, and under Lamar's version of the facts, it was not clear that the individual's actions were unlawful. While Lamar argues she was only a citizen speaking on a matter of public concern, she was also the Affirmative Action Specialist who was responsible for preparing an Affirmative Action Report for the City. Contrary to Lamar's assertions, it was not clearly established that her First Amendment interests outweighed the interests of the City in preserving the efficiency of government services. Lamar has not provided any cases which establish that the law was clear under similar facts to the present action that it would have been apparent to a reasonable person that the individual defendants' actions were unlawful. Therefore, based on the facts construed in the light most favorable to Lamar, the individual defendants are clearly entitled to qualified immunity. *See Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir.1998) (Because the first two prongs "involve legal determinations that are intensely fact-specific and do not lend themselves to clear, bright-line rules, it is nearly impossible for a reasonable person to predict how a court will weigh the myriad factors that inform an application of the *Pickering–Connick* test. Consequently, a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful."); *see also Sims v. Metropolitan·Dade County*, 972 F.2d 1230, 1237 (11th Cir.1992) ("This court also has recognized the difficult position of the public employer, which must decide whether to take disciplinary action without the aid of a bright-line standard to measure the constitutionality of its conduct. 'Because no bright line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.' ") (citing *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1323 (11th Cir.1989)).

■ Turning to Lamar's claims based on discrimination, the Court also finds that the law was not clearly established based on the facts presented that the individual defendants' actions were unlawful. The individual defendants were faced with a confusing situation where an employee was in charge of an area dealing with discrimination in the workplace. Clearly, the City and its employees were not entitled to treat Lamar differently based on her race or gender. However, it was unclear how to treat Lamar based on her opinions regarding discrimination. Here, it is undisputed that Lamar and her supervisors disagreed about whether there was any systemic discrimination within the City's government, and if so, the extent of such discrimination. Lamar's supervisors could reasonably believe that disciplining her for disregarding her supervisors' order to change portions of the City's Affirmative Action Report was not clearly a violation of the law. Thus, the Court finds that it was not apparent that the individual defendants' actions were unlawful, and therefore, the individual defendants are entitled to qualified immunity in their individual capacities.. *See, e.g., Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. Unit B.1980) (finding plaintiff who formerly handled employer's discrimination complaints failed to establish Title VII claim).

## IV. CONCLUSION

Lamar has brought the present action against the defendants asserting she was discriminated against because of her race and gender and that she was retaliated against because of her protected speech. The Court notes that it is undisputed that

Lamar and her supervisors disagreed about the extent of any systemic discrimination within the City. It is also undisputed that Lamar refused to make changes to the City's Affirmative Action Report, which were requested by her supervisors, and that she distributed the Report without her supervisors' review. Lamar's employment was then terminated. While Lamar may have been entitled as a citizen to express her opinions regarding what she honestly perceived as systemic discrimination in the hiring and promotion practices of the City with respect to its employees, she was not entitled to express such opinions, over her supervisor's objections, in the City's own formal document. Therefore, the Court holds that the City's termination of Lamar's employment, and the other adverse treatment Lamar received, was not based upon her protected speech or her race or gender, but rather was based upon disagreements between Lamar and her supervisors and her own insubordination.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant John Panoch's Motion for Summary Judgment [DE 135] is hereby **GRANTED;**

2. Defendant Bruce Larkin's Motion for Summary Judgment [DE 137] is hereby **GRANTED;**

3. Defendant Pete Witschen's Motion for Summary Judgment [DE 139] is hereby **GRANTED;**

4. Defendant George Hanbury's Motion for Summary Judgment [DE 141] is hereby **GRANTED;**

5. The Defendant City of Fort Lauderdale's Motion for Summary Judgment [DE 143] is hereby **GRANTED;**

6. Final Summary Judgment is hereby entered in favor of the defendants, City of Fort Lauderdale, John Panoch, Bruce Larkin, Pete Witschen, and George Hanbury,

and against the plaintiff, Deborah Rice–Lamar, and the plaintiff shall take nothing from this action;

7. All pending motions are hereby **DENIED** as moot; and

8. This case is closed.

**DONE AND ORDERED.**