[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV - 8 2000
THOMAS K. KAHN
CLERK

No. 99-12951

D. C. Docket No. 97-07007-CV-WPD

DEBORAH RICE-LAMAR,

Plaintiff-Appellant,

versus

CITY OF FORT LAUDERDALE, FLORIDA, a
municipality, GEORGE HANBURY, individually,
PETE WITSCHEN, Asst. City Attorney,
individually, BRUCE LARKIN, individually, JOHN
PANOCH, individually,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

**(November 8, 2000)**

Before TJOFLAT, MARCUS and CUDAHY\*, Circuit Judges.

_____

*Honorable Richard D. Cudahy, U.S. Circuit Judge for the Seventh Circuit, sitting by
designation.

TJOFLAT, Circuit Judge:

I.

A.

The City Manager's Office (the "CMO") in the City of Ft. Lauderdale, Florida, oversees a large and complex bureaucratic structure. Under the CMO, which includes not only the City Manager, himself, but also Assistant City Managers and various other personnel, are seven City Departments: Police, Public Services, Fire Rescue and Building, Administrative Services, Finance, Parks and Recreation, and Planning and Economic Development. Each Department is comprised of several Divisions. One such Division within each of the Departments is the Personnel Division.

The City Manager serves at the pleasure of an elected City Commission. In order to ensure racial, ethnic, and gender diversity in the City's hiring practices, the Ft. Lauderdale City Commission requested that the CMO prepare annual reports detailing the City's progress in hiring and retaining minority employees. The CMO assigned this task to the Affirmative Action Specialist, who reports to the Director of Personnel in the Administrative Services Department.

On June 20, 1988, Deborah Rice-Lamar, an African-American female, was hired to be the City's Affirmative Action Specialist. Rice-Lamar's job description

2

stated that one of her principal tasks was to "advise[] departmental and personnel officials as well as the City Manager on potential EEO liabilities and on strategies for achieving . . . long term [affirmative action] goals."[1]  Though her "work [was to be] performed with considerable independent judgment, discretion and initiative," the job description made clear that it was also to be "reviewed by an administrative superior through conferences, periodic reports, and observation of results achieved."   Rice-Lamar presented the 1996 Affirmative Action Report at a Department meeting on June 19, 1996.  Entitled "Economic Integration: Affirmative Action for the New Millennium," the report included a dramatic personal commentary by Rice-Lamar, which stated:

> [W]e are still a City plagued with racism, glass ceilings for women and brick walls for people of color, a tolerance for perceptions of unfairness and a proverbial silence about it all.  We make plans for valuing and managing diversity initiatives within the City which should create an environment where differences are valued as an advantage[,] not just tolerated.  However, differences must first be acknowledged before either tolerated or valued.  Recommendations on the City's diversity initiative are forthcoming; however, I will take this opportunity to foretell that they will acknowledge our need to address some basic problem of "ism" while moving toward an environment which values diversity and manages diversity for the betterment of all.

---

[1] Specifically, Rice-Lamar's "Work Plan" (a document that was separate from the job description) stated that one of her principal tasks was to compile "Annual City-Wide Updates" regarding affirmative action in City employment.

Also included were statistical graphs indicating the number of African-American, Hispanic, and female City employees in management and professional positions.

George Hanbury, the City Manager, Pete Witschen, an Assistant City Manager, Bruce Larkin, the Director of the Administrative Services Department, and John Panoch, the Director of the Personnel Division of the Administrative Services Department, all expressed serious reservations about the content of the report, and requested that Rice-Lamar make various substantive changes before the report was delivered to the City Commission. In particular, Rice-Lamar's superiors directed her to remove the personal commentary, and to draft a report that focused on the statistical data collected on minority and female representation in the City workforce. Rice-Lamar refused to alter the report substantially. On July 22, 1996, she left a revised copy of the report in Larkin's and Panoch's respective offices, with a message that it was ready for printing and distribution. The report still contained much of the personal commentary that her superiors had directed her to remove.[2]

---

[2] The revised report stated:
[W]e are still a City plagued with real and/or perceptions of racism, glass ceilings for women and walls for people of color. These issues whether real or perceived must be discussed. For that reason we make plans for valuing and managing diversity initiatives within the City which should create an environment where differences are valued as an advantage[,] not just tolerated. However, differences must first be acknowledged before either tolerated or valued[;] therein lies the need for discussion. Recommendations on the City's diversity initiative are

On July 26, Larkin met with Rice-Lamar and offered her the opportunity to resign. She refused, stating in a letter to Larkin that

> [t]he Affirmative Action Report . . . honestly and objectively outlines racial problems and tensions in the City.
> Apparently, your concern over public image have [sic] led you to suppress the publication of my report and request my resignation.

On July 29, without Larkin's review or approval, Rice-Lamar distributed the report to Hanbury, and all but one of the Department heads. On August 12, Rice-Lamar was notified by memorandum from Panoch of possible disciplinary action against her, based, in part, on the fact that "numerous deadlines [had been] missed and instructions [were] not followed" with regard to the "Affirmative Action presentation and report." After affording Rice-Lamar an opportunity to be heard, Larkin recommended to the City Manager that she be discharged. The City Manager accepted the recommendation and discharged her effective October 21, 1996.

### B.

Rice-Lamar brought this suit against the City of Ft. Lauderdale, Hanbury, Witschen, Larkin, and Panoch in the United States District Court for the Southern

---

forthcoming and will acknowledge our need to address some basic problem of "ism" while moving toward an environment which values diversity and manages diversity for the betterment of all.

District of Florida.  In a twelve-count complaint,[3] she sought money damages and, alternatively, reinstatement and back pay, against the City and the individual defendants for discriminating against her on account of her race and sex, in violation of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (1994),[4] and 42 U.S.C. § 1981 (1994),[5] and for infringing

---

[3] We refer to Rice-Lamar's second amended complaint as the complaint.

[4] 42 U.S.C. § 2000e-2(a) makes it unlawful for an employer:
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
We realize that Title VII only allows suits against an "employer."  We mention Rice-Lamar's Title VII claims against the individual defendants, who are not Rice-Lamar's employers, for the sake of completeness only.

[5] 42 U.S.C. § 1981 provides:
(a) Statement of equal rights
        All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined
        For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment
        The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.
We assume without implying any view on the matter that the individual defendants can

6

her First Amendment right to free speech.[6]  As a vehicle for recovery, Rice-Lamar

invoked 42 U.S.C. § 1983. (1994)[7]  Finally, she claimed that the individual

defendants had conspired to discriminate against her on account of her race and sex

in violation of 42 U.S.C. § 1985(3) (1994).[8]

_____

be properly sued under section 1981 in these circumstances.

[6] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  This right was made applicable to the states by the Fourteenth Amendment.  Everson v. Board of Educ., 330 U.S. 1, 8, 67 S. Ct. 504, 508, 91 L. Ed. 711 (1947).

[7] 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[8] 42 U.S.C. § 1985(3) provides:
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

In their answers to Rice-Lamar's complaint, the defendants denied liability and the individual defendants claimed qualified immunity from suit.

Following discovery, the defendants moved for summary judgment. The district court granted their motions, concluding that Rice-Lamar failed to make out a case under any of her theories of liability. The court also concluded that the individual defendants were immune from suit under the doctrine of qualified immunity. We now affirm the court's judgment. We do so on the basis that the record before the district court was insufficient as a matter of law to establish any of Rice-Lamar's claims for relief. (We therefore do not reach the question whether any individual defendant is entitled to qualified immunity.)

## II.

We review <u>de novo</u> orders granting a motion for summary judgment. <u>Warren v. Crawford</u>, 927 F.2d 559, 561 (11th Cir. 1991). "The district court's conclusion[s] of law [are] subject to complete and independent review by this court." <u>In re Sure-Snap Corp.</u>, 983 F.2d 1015, 1017 (11th Cir. 1993).

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986). When the non-moving party bears the burden of proof on an issue at trial, the moving party need not "support its motion with affidavits or other similar material negating the opponent's claim," id. at 323, 106 S. Ct. at 2553, in order to discharge this initial responsibility. Instead, the moving party simply may "'show[]'–that is, point[] out to the district court–that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. at 2554 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970)).

In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the court must enter summary judgment for the moving party. Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. In determining whether genuine issues of material fact exist, we resolve all ambiguities and draw

9

all justifiable inferences in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).

## III.

We first address Rice-Lamar's First Amendment free speech claim.  Second, we address her claim that she was discriminated against on the basis of her race and sex.

## A.

It is well established that a state may not discharge a public employee in retaliation for public speech. Rankin v. McPherson, 483 U.S. 378, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987).  This circuit employs a four-part test to determine whether a state (or, as in this case, a city) has done so.

First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1689, 75 L. Ed. 2d 708 (1983); Rankin, 483 U.S. at 384, 107 S. Ct. at 2896; Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993), cert. denied, 512 U.S. 1221, 114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994) (citing Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989)).  Speech addresses a matter of public concern when the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S. Ct. at 1690. . . .

Second, a court must weigh the employee's "[F]irst [A]mendment interests" against the interest of the City, as an

10

employer, "in promoting the efficiency of the public services it performs through its employees." Morgan, 6 F.3d at 754. In performing this balancing test, a court must consider several factors: (1) whether the speech at issue impeded the government's ability to perform its duties effectively; (2) the manner, time and place of the speech; and (3) the context within which the speech was made. Connick, 461 U.S. at 151-55, 103 S. Ct. at 1692-94; Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988), cert. denied, 489 U.S. 1013, 109 S. Ct. 1124, 103 L. Ed. 2d 187 (1989). . . .

      Third, a court must determine whether the speech in question played a "substantial part" in the government's decision to discharge the employee. . . .

      Fourth, if the employee shows that the speech was a substantial motivating factor in the decision to discharge him, the City must prove by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct.

Fikes v. City of Daphne, 79 F.3d 1079, 1083-85 (11th Cir. 1996).

We will assume without deciding that Rice-Lamar's expression constitutes speech on a matter of public concern, and dispose of the issue on the ground that her First Amendment interests are outweighed by the City's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees." Morgan, 6 F.3d at 754 (internal quotation marks omitted).[9]

[I]n weighing the State's interest in [disciplining] an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the

---

[9] The question of whether a plaintiff's First Amendment interests outweigh the employer's interest in promoting the efficiency of the public services it performs is a question of law subject to de novo review. See Connick, 461 U.S. at 150 n.10, 103 S. Ct. at 1692 n.10.

words they speak will vary with the extent of authority and public accountability the employee's role entails.

Rankin v. McPherson, 483 U.S. 378, 388, 107 S. Ct. 2891, 2899, 97 L. Ed. 2d 315 (1987). In the instant case, one of Rice-Lamar's primary responsibilities within the Ft. Lauderdale Department of Administrative Services was to write an annual Affirmative Action Report to be presented to the City Commission. Although her job description stated that Rice-Lamar was to perform her job "with considerable independent judgment," all of her work was ultimately to be "reviewed by an administrative superior through conferences, periodic reports, and observation of results achieved." Because Rice-Lamar refused to alter the report in accordance with her superiors' instructions, any First Amendment interest she may have had in publishing her views is outweighed by the City's interest in producing an official document that conformed to the City's expectations.

As Justice Brennan stated in his dissent in Connick,

[p]erhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal.

Connick, 461 U.S. at 163 n.3, 103 S. Ct. at 1699 n.3 (Brennan, J., dissenting).

Contrary to Rice-Lamar's perception, her job with the City did not involve

12

utilizing the City's resources to crusade for her personal vision of social justice; her job was to follow her superiors' lawful instructions. By declining to alter the Affirmative Action Report after she was given a direct order to do so, Rice-Lamar flatly refused to perform a lawful task within the scope of her duties. "Such a refusal to abide by a valid order is closely connected with, and can be classified as insubordination." Hankard v. Town of Avon, 126 F.3d 418, 423 (2d Cir. 1997) (holding that employees could be fired for refusing to obey government employer's order to alter a report concerning racial discrimination allegedly committed by another employee).

In a very real sense, the report cannot even be classified as Rice-Lamar's speech at all. The report was the City's document. Although Rice-Lamar collected the statistics and wrote the words contained in the report, she did so at the behest of her employer; and the report was subject to her superiors' approval before it could be distributed to the City Commission. Just as a government employer has only a limited right to control its employees' speech, employees also have very little right to control the content of their employer's speech.[10]

---

[10] Our notice of the fact that the Affirmative Action Report may not be accurately characterized as Rice-Lamar's speech (as opposed to the City's speech) heightens our doubt that the speech at issue should receive any First Amendment protection. See Youker v. Schoenenberger, 22 F.3d 163, 166 (7th Cir. 1994) ("[T]he speech in the present case is not protected because it was not speech as a citizen because [the plaintiff] represented, without authority, that it was [the government employer's] official speech.").

13

We caution that this would be a different case if Rice-Lamar had used a means of communication that was not under the exclusive control of her employer. Although we intimate no view concerning the outcome of such a case, different considerations would obviously come to the fore if Rice-Lamar had, for example, written an editorial for a local newspaper, or even if she had attempted to communicate her concerns privately to the City Commission. In the instant case, however, Rice-Lamar attempted to publish her personal views in a document that was both under the control, and vested with the authority, of her employer, the City of Ft. Lauderdale. Civil servants cannot cry foul when they attempt to use their government employers as stage dummies, and are then disciplined for it.

B.

Rice-Lamar also contends that the district court erred in granting summary judgment to all the defendants on her claims of discrimination under Title VII of the Civil Rights Act of 1964, and 42 U.S.C. §§ 1981, 1983, and 1985(3).

Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973), a plaintiff can establish a prima facie case that she was discriminated against in violation of Title VII by showing: (1) she is a member of a protected class; (2) she was subjected to adverse employment action;

14

(3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue. See Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Once a prima facie case is shown,

> the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. . . .
> . . . [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255-56, 101 S. Ct. 1089, 1094-95, 67 L. Ed. 2d 207 (1981).[11]

> In the instant case, the district court found that even though

> there are genuine issues of material facts with respect to whether [Rice-Lamar] has established her prima facie case . . .[,] there are no genuine issues of material facts as to whether the City's stated

---

[11] The elements of a section 1983 claim of race or gender discrimination are the same as the elements of a Title VII disparate treatment action. See Cross v. Alabama, 49 F.3d 1490, 1507-08 (11th Cir. 1995). The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context. See Peterson v. BMI Refractories, 132 F.3d 1405, 1412 n.13 (11th Cir. 1998).

15

legitimate, nondiscriminatory reasons for its actions were pretextual. .
. . . [I]t is undisputed that [Rice-Lamar] was disciplined for refusing to
follow her supervisors' instructions. Although the subject matter of
the dispute between [Rice-Lamar] and her supervisors involved race
and gender discrimination, the City's actions with respect to [Rice-
Lamar] herself were not due to her race or gender. Rather, they were
due to her insistence on including her own conclusions in the
Affirmative Action Reports against her supervisors' wishes.

Rice-Lamar v. City of Ft. Lauderdale, 54 F. Supp. 2d 1137, 1146 (S.D. Fla. 1998).

Rice-Lamar does not dispute that she refused to alter substantially the

Affirmative Action Report, and she has failed to present any evidence indicating

that other insubordinate employees were treated more favorably. Cf. Reeves v.

Sanderson Plumbing Prods., Inc., __ U.S. __, __, 120 S. Ct. 2097, 2107, __ L. Ed.

2d __ (2000) (finding error in grant of judgment as a matter of law to defendant in

an age discrimination claim, in part because plaintiff "made a substantial showing

that [defendant's] explanation [for the adverse employment action] was false"). In

response to a properly supported motion for summary judgment, "an adverse party

may not rest upon the mere allegations or denials of the adverse party's pleadings,

but . . . must set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e).[12]  Because Rice-Lamar has failed to present any evidence

_____

[12] Rice-Lamar argues that the defendants never alerted her that part of the City's
nondiscriminatory rationale for her discharge was her insubordination in connection with the
1996 Affirmative Action Report. Defendants' answer to plaintiff's complaint, however, states
that "Defendants admit that Plaintiff was suspended and then terminated for distributing the
1996 Affirmative Action Report . . . to senior management employees without obtaining the

demonstrating that the City's proffered explanation is pretextual, the district court did not err in granting summary judgment to the defendants on her discrimination claims.[13]

## IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the defendants on all claims.

AFFIRMED.

---

prior approval of her supervisors."

[13] Our disposition of Rice-Lamar's discrimination claims obviates the need for us to address her conspiracy claim under 42 U.S.C. § 1985(3).

We affirm without discussion the district court's denial of Rice-Lamar's motion to amend her complaint to state a claim of retaliation under Title VII.