[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13069

_____

D.C. Docket No. 1:07-cv-00104-JRH-WLB

ST. JOSEPH HOSPITAL, AUGUSTA,
GEORGIA, INC.,
ST. JOSEPH VENTURES, INC.,
ST. JOSEPH M.O.B., L.P.,
a Georgia Limited Partnership,

Plaintiffs - Counter
Defendants - Appellants,

versus

HEALTH MANAGEMENT ASSOCIATES, INC.,

Defendant - Counter
Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(January 24, 2013)

Before TJOFLAT, PRYOR and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, a corporate owner and operator of healthcare facilities across the United States reneged on its "promise" to purchase the assets of a hospital in Augusta, Georgia, so the hospital sued the corporation for breach of contract and, alternatively, under the doctrine of promissory estoppel.  It sought to recover as damages the approximate difference between the price the corporation promised to pay for the hospital's assets, $75 million, and the price the hospital obtained, approximately $37 million, when it sold the assets to a third party.  The corporation is Hospital Management Association, Inc. ("HMA").  The hospital is St. Joseph Hospital ("SJH"), a non-profit, general acute care facility located in Augusta, Georgia.[1]

SJH sued HMA in the Superior Court of Richmond County, Georgia.  HMA removed the case to the United States District Court for the Southern District of Georgia,[2] and after the parties joined issue and engaged in discovery, HMA moved the District Court for summary judgment.  The District Court granted HMA's

---

[1] The hospital is owned and operated by St. Joseph Hospital, Augusta, Georgia, Inc., St. Joseph Ventures, Inc., and St. Joseph M.O.B., L.P. (collectively "SJH").

[2] HMA removed the case pursuant to 28 U.S.C. §§ 1441 and 1446, asserting that diversity of citizenship existed between the parties, in that HMA is a Delaware corporation with its principal place of business in Florida, and SJH is a Georgia corporation with its principal place of business in Georgia.

motion and entered final judgment accordingly.  SJH appeals the judgment.  We affirm.

## I.

We begin our review of the District Court's decision with a recitation of the historical facts underpinning SJH's claims for breach of contract and promissory estoppel.

## A.

In July 2005, SJH sought bids for the purchase of its hospital assets.[3]  HMA submitted the highest of several bids, and the parties began negotiating the terms of the purchase.  By December 2005, they had reduced the terms to writing in a draft agreement (the "Asset Sale Agreement" or the "Agreement").  Sections 2.2 and 3.2 of the Agreement, titled "Binding Agreement," stated that the Agreement would "constitute[] a valid and binding obligation" of the parties when both HMA and SJH "duly and validly execute[] and deliver[]" it.  Record, vol. 1, no. 1-2, at 63–64, 72.  Before the parties could execute the Agreement, however, they needed to submit it to the Attorney General of Georgia for his approval.  The Georgia Hospital Acquisition Act (the "Acquisition Act") mandates that a transfer of fifty percent or more of the assets of a non-profit hospital cannot go forward without the Attorney General's consent. O.C.G.A. § 31-7-400 (2012) et seq.  The parties to

---

[3]  SJH sought bids for some of its other assets as well.  We treat the hospital assets as including those other assets.

the transfer must notify the Attorney General of the terms of the transfer at least ninety days before it is to take place;[4] then, within sixty days after receiving notice, the Attorney General must hold a public hearing.[5]

On December 22, 2005, the parties submitted to the Attorney General the Acquisition Act's prescribed Notice of Intent to Acquire or Dispose of Assets of a Hospital (the "Notice of Intent" or the "Notice"). The Notice informed the Attorney General that HMA had agreed to purchase SJH's assets under the terms stated in an Asset Sale Agreement, an unsigned copy of which was attached to the Notice, and stated that the transaction would be closed "as soon as practical after the Attorney General Process is concluded." Record, vol. 1, no. 1-2, at 26. On receiving the Notice, the Attorney General scheduled a public hearing on the parties' proposal for February 13, 2006, in Augusta, Georgia.

After the parties notified the Attorney General of their intent, HMA made several public announcements about its negotiations with SJH. On December 27, 2005, HMA issued a news release, which stated that it had "negotiated an agreement to acquire St. Joseph" and that "[t]he execution and closing of the purchase agreement [were] subject to the review and approval of the Georgia Attorney General's office pursuant to applicable state law." Record, vol. 1, no. 1-

---

[4] See O.C.G.A. § 31-7-401 (2012).
[5] See O.C.G.A. § 31-7-405 (2012).

4

4, at 82.  Two days later, HMA filed a Form 10-K annual report with the Securities and Exchange Commission (the "SEC"),[6] which included a statement "announc[ing] the negotiation of an agreement to acquire St. Joseph Hospital" and that "the execution of a definitive purchase agreement and closing of the transaction [were] subject to review and approval by the Georgia Attorney General's office."  Record, vol. 1, no. 1-3, at 21.  On January 3, 2006, HMA issued another "news release," proclaiming that it had "signed or finalized negotiations on definitive agreements regarding four acquisition opportunities" and, in reference to the SJH acquisition, stating that "upon completion of the previously announced transaction [] to acquire the 231-bed St. Joseph Hospital . . . , HMA will operate 61 hospitals in 16 states with approximately 8,912 licensed beds."  Record, vol. 1, no. 1-4, at 85.  On January 13, HMA issued a third news release that included a similar statement.  On January 24, HMA issued a "press release," announcing once again that it had "negotiated an agreement to acquire the 231-bed St. Joseph Hospital" and that "execution and closing of the purchase agreement [were] subject to review and approval of the Georgia Attorney General's office pursuant to applicable state law."[7]  Record, vol. 5, no. 108, Ex. J,

---

[6] The Form 10-K reported on HMA's financial condition at the close of its 2005 fiscal year on September 30, 2005.

[7] In addition to the above announcements, HMA engaged in transitional activities at SJH's hospital.  It installed its own computer systems, applied to have certain licenses changed from SJH to HMA, sent its representatives to attend meetings with the hospital's staff, and

5

at 5.  On February 9, HMA filed a Form 10-Q quarterly report with the SEC,[8]

which included a statement similar to the one contained in its earlier Form 10-K

report.

B.

Section 201 of the Hart-Scott-Rodino Antitrust Improvements Act of 1976

(the "HSR Act"), 15 U.S.C. §18a (2006), requires the Federal Trade Commission

(the "FTC") and the Department of Justice (the "DOJ") to scrutinize the antitrust

implications of any transfer or acquisition of assets valued at over $50 million.[9]

Since the transaction the parties contemplated involved the transfer of assets

exceeding $50 million in value, they filed with the FTC and the DOJ, on January

trained the staff on HMA protocol.

[8]   The Form 10-Q reported on HMA's financial condition at the close of the first quarter of the 2005 fiscal year, October 1, 2005 through December 31, 2005.

[9]   The HRS Act, 15 U.S.C. § 18a (2006), titled "Premerger notification and waiting period," states in relevant part:

> (a) Filing
>
> [N]o person shall acquire, directly or indirectly, any . . . assets of any other person, unless both persons . . . file notification pursuant to rules under subsection (d)(1) of this section and the waiting period described in subsection (b)(1) of this section has expired, if
> (1)  the acquiring person, or the person whose . . . assets are being acquired, is engaged in commerce or in any activity affecting commerce; and
> (2)  as a result of such acquisition, the acquiring person would hold an aggregate total amount of the . . . assets of the acquired person --
>
> . . . .
>
> (B)(i)  in excess of $50,000,000 (as so adjusted and published) but not in excess of $200,000,000 (as so adjusted and published). . . .

6

27, 2006, a "Premerger Notification and Report" (the "Premerger Notification").

Attached to the Premerger Notification as Exhibits were a "Letter of Intent,"

which the parties executed on January 25, 2006, and the unsigned Asset Sale

Agreement that they sent to the Georgia Attorney General with their Notice of

Intent on December 22, 2005. The HSR Act precluded HMA from acquiring

SJH's assets until the Act's "waiting period" expired. The waiting period began

the day the FTC and the Assistant Attorney General in charge of the DOJ's

Antitrust Division received the Premerger Notification, presumably January 27,

2006, and would end on February 26, 2006, unless terminated before that date by

the FTC and the Assistant Attorney General.[10]

---

[10] The HSR Act states in relevant part:

(b) Waiting period; publication; voting securities

(1) The waiting period required under subsection (a) of this section shall--
(A) begin on the date of the receipt by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice (hereinafter referred to in this section as the "Assistant Attorney General") of --
(i) the completed notification required under subsection (a) of this section, or
(ii) if such notification is not completed, the notification to the extent completed and a statement of the reasons for such noncompliance, from both persons . . . ; and
(B) end on the thirtieth day after the date of such receipt . . . , or on such later date as may be set under subsection (e)(2) or (g)(2) of this section.
(2) The Federal Trade Commission and the Assistant Attorney General may, in individual cases, terminate the waiting period specified in paragraph (1) and allow any person to proceed with any acquisition subject to this section, and promptly shall cause to be published in the Federal Register a notice that neither intends to take any action within such period with respect to such acquisition.

. . . .

C.

The Letter of Intent (the "Letter"), which the parties ascribed to by signing it,[11] "set forth [their] mutual understanding . . . with respect to" HMA's acquisition of SJH's assets.  Record, vol. 1, no. 1-5, at 5.  In its second paragraph, the Letter "reflect[ed] the parties' intention to finalize and execute a binding Asset Sale

---

(e)  Additional information; waiting period extensions

(1)(A)  The Federal Trade Commission or the Assistant Attorney General may, prior to the expiration of the 30-day waiting period . . . specified in subsection (b)(1) of this section, require the submission of additional information or documentary material relevant to the proposed acquisition, from a person required to file notification with respect to such acquisition under subsection (a) of this section prior to the expiration of the waiting period specified in subsection (b)(1) of this section. . . .

. . . .

(2) The Federal Trade Commission or the Assistant Attorney General, in its or his discretion, may extend the 30-day waiting period . . . specified in subsection (b)(1) of this section for an additional period of not more than 30 days . . . after the date on which the Federal Trade Commission or the Assistant Attorney General, as the case may be, receives from any person to whom a request is made under paragraph (1) . . . . (A) all the information and documentary material required to be submitted pursuant to such a request, or (B) if such request is not fully complied with, the information and documentary material submitted and a statement of the reasons for such noncompliance. Such additional period may be further extended only by the United States district court, upon an application by the Federal Trade Commission or the Assistant Attorney General pursuant to subsection (g)(2) of this section.

. . . .

[11]  HMA's Senior Vice President and General Counsel, Timothy R. Parry, wrote the Letter of Intent and addressed to "St. Joseph Hospital, Augusta, Georgia, Inc., St. Joseph Ventures, Inc., and St. Joseph M.O.B., L.P."  Record, vol. 1, no. 1-5, at 5.  Parry signed the letter for HMA.  Senior officers of the respective addressees also signed it.  A copy of the Letter of Intent was sent to the Georgia Attorney General after the parties signed it.

8

Agreement in the current form attached to this Letter of Intent[12] . . . with those changes (a) which are required by the Attorney General of the State of Georgia . . . , (b) which otherwise result from the process set forth in [the Acquisition Act], or (c) which are otherwise agreed upon [by the parties]." Id.

The third, fourth, and fifth paragraphs of the Letter obligated the respective parties as follows. In the third paragraph, SJH promised that from January 25, 2006, "through the earlier of (a) the execution of the Asset Sale Agreement and (b) March 31, 2006, [it] shall not . . . , without the prior written consent of [HMA]," offer to sell or lease to a third party or otherwise alienate the assets of the hospital. Id. at 5–6.[13] In the fourth paragraph, each party consented to the other party

---

[12] Attached to the Letter of Intent was a copy of the unsigned Asset Sale Agreement the parties attached to the Notice of Intent they sent to the Georgia Attorney General on December 22, 2005.

[13] In full, the third paragraph stated the following.

From the date of this Letter of Intent through the earlier of (a) the execution of the Asset Sale Agreement and (b) March 31, 2006, Seller shall not . . ., without the prior written consent of Purchaser: (i) offer for sale or lease . . . the [hospital assets] (or any material portion thereof), whether by merger, consolidation, purchase of assets, joint venture, exchange or otherwise; (ii) solicit, negotiate, initiate or encourage to take other action to facilitate (by way of furnishing access, non-public information or otherwise) offers to buy all or any material portion of the . . . [hospital assets]; (iii) hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of . . . the [hospital assets]. Notwithstanding the foregoing, this paragraph shall not be construed to prohibit Seller . . . from engaging in corporate transactions involving Seller's . . . stock or securities, membership interests or partnership interests, as applicable, including, without limitation, membership substitution transactions, so long as the terms thereof (x) do not contemplate the sale or lease or other disposition of the . . . [hospital assets], (y) would not affect Seller's control over the disposition of the [hospital assets] to Purchaser, or (z)

"making the necessary filings and/or notifications, if any, with all governmental agencies or authorities which are required to be made, including . . . pursuant to [the Acquisition Act] . . . in order for [HMA] to acquire the assets described in the Asset Sale Agreement." Id. at 6.  The parties also "agree[d] to cooperate with each other concerning the Sale Transaction (i) in the preparation and submittal of any filings required pursuant to the [Acquisition Act] and (ii) during the course of any public hearings which take place pursuant to the [Acquisition  Act]." Id.  The fifth paragraph provided that "[i]n the event a definitive Asset Sale Agreement is not executed," each party would "bear its own legal, accounting and other fees and expenses related to the proposed transaction," subject to certain exceptions not relevant here.  Id.

The sixth paragraph explained the parties' intent in executing the Letter of Intent with this statement:

> This Letter of Intent is intended as an expression of mutual intent only and does not constitute an obligation binding in any way on the parties, except for the provisions of the third, fourth and fifth paragraphs hereof.  This Letter of Intent will be governed by and construed in accordance with the laws of the State of Georgia.

Id. at 6–7.

---

would not otherwise restrict the ability of Seller to convey the [hospital assets] to Purchaser in the Closing.

SJH sent a copy of the Letter to the Georgia Attorney General the day the parties signed it, January 25, 2006.  SJH's transmittal letter explained that the "[Letter] was required for the parties' Hart-Scott-Rodino filing" and "[was] nonbinding as to the sale of the assets."  Record, vol. 4, no. 103, Ex. 223, at 1.

On February 12, 2006, HMA informed SJH that it would not sign the Asset Sale Agreement.[14]  On February 13, 2006, the day the Attorney General was to hold a public hearing on the proposed transaction, HMA advised the Attorney General that it was "withdrawing its non-binding offer to acquire St. Joseph Hospital and other related assets" because "the hospital ha[d] experienced significant deterioration in its operating performance including adverse changes in physician referral practices since the submission of the [Notice of Intent]."  Record, vol. 4, no. 103, Ex. 25, at 1.  On being so advised, the Attorney General cancelled the hearing and closed the public record in the matter.  On November 1, 2006, SJH sold the hospital assets to a third party for approximately $37 million.

---

[14]  Notwithstanding its public statements to the effect that it had negotiated the purchase of SJH's hospital assets, HMA was concerned about the hospital's financial health.  Based on a visit to the hospital and a review of SJH's February 2006 financial analysis, HMA's president, who had succeeded his predecessor on January 1, 2006, and had not been involved in the parties' negotiations, determined that HMA should abandon its plan to purchase SJH's assets.

11

II.

A.

SJH filed this lawsuit to recover the loss it claims it sustained, in excess of $35 million, as a result of HMA's failure to go through with the purchase. Its complaint contained five counts. Two are before the court today: Count One, which sounds in contract; Count Four, which sounds in promissory estoppel.[15]

Count One incorporates by reference the historical facts recited in subparts A and C of part I, supra, and alleges that SJH and HMA "ultimately . . . reached a firm and definite agreement, as evidenced by writings signed by the parties that contain all of the material terms of the contract for the purchase and sale of the assets of the hospital." Record, vol. 1, no. 1-2, ¶ 12. Attached to the complaint as an exhibit, and made a part of this allegation, is the Notice of Intent the parties submitted to the Attorney General on December 22, 2005, which appends the

---

[15] The three counts not before us in this appeal are Counts Two, Three, and Five. Count Two, seeking damages in excess of $35 million, alleges that HMA breached a duty of good faith and cooperation implicit in the Asset Sale Agreement. Count Three, seeking "damages in an amount to be proven at trial," alleges that HMA breached its contractual duty to maintain in confidence information it gained from SJH while negotiating the purchase of its assets. Record, vol. 1, no. 1-2, ¶ 34. Count Five, which incorporates by reference Counts One through Four, seeks "attorneys' fees, litigation expenses and costs . . . pursuant to O.C.G.A. § 13-6-11[(2012)]." Id. at 10. Section 13-5-30 of the Official Code of Georgia Annotated, titled "Expenses of litigation," states the following: "Expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11(2012).

Asset Sale Agreement.  Count One alleges, in the next sentence, that "[t]hereafter, HMA repeatedly confirmed in writing in its [SEC] filings signed by HMA's officers and in its press and news releases that it had agreed to purchase the assets of the hospital."  Id.  Attached to the complaint as exhibits, and made part of this allegation, are the press and news releases and SEC reports HMA issued between December 27, 2005 and February 9, 2006.[16]

Count Four, an alternative basis for the recovery of damages, assumes that the parties did not reach an enforceable contract and alleges that "HMA promised to purchase the assets of [SJH] and reasonably expected to and did induce [SJH] to rely on its promises," id. ¶ 36, and that "[SJH] reasonably relied on HMA's repeated promises and public statements that HMA agreed to purchase the assets of [SJH]."  Id. ¶ 37.

HMA's answer to Count One admits the allegations of historical fact except that the Asset Sale Agreement constituted a binding contract between the parties.  As an affirmative defense, apparently assuming that Count One is based on an oral agreement, HMA asserts that the agreement, if incorporating the terms of the Asset Sale Agreement, was unenforceable under Georgia's statute of frauds, O.C.G.A. § 11-2-201 (2012) and  O.C.G.A. § 13-5-30 (2012).[17]  HMA's answer to Count

---

[16]  See supra part I.A.

[17]  Section 11-2-201 of the Official Code of Georgia Annotated, titled "Formal requirements; statute of frauds," states in pertinent part:

Four admits the allegations of historical fact and asserts as an affirmative defense that Count Four failed to state a claim for relief.

## B.

Following discovery, the parties filed cross motions for summary judgment.[18]  The District Court granted HMA's motion on Counts One, Two, Four and Five of SJH's complaint,[19] and denied SJH's motion.  Addressing the Count One claim, the court found nothing in the record to support SJH's argument that by the time the parties submitted the Notice of Intent to the Attorney General on December 22, 2005, or at any time after that and prior to HMA's withdrawal, they

---

> (1)  Except as otherwise provided in this Code section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

O.C.G.A. § 11-2-201 (2012).

> Section 13-5-30 of the Official Code of Georgia Annotated, titled "Obligations which must be in writing," states in pertinent part:

> To make the following obligations binding on the promisor, the promise must  be in writing and signed by the party to be charged therewith or some person lawfully authorized by him:

> . . . .

> (4) Any contract for sale of lands, or any interest in, or concerning lands . . . .

O.C.G.A. § 13-5-30 (2012).

[18]  HMA moved for summary judgment on all five counts of the complaint.  SJH moved for summary judgment on Count One only.

[19]  The court denied HMA's motion for summary judgment on Count Three.

had reached an agreement calling for HMA to purchase SJH's hospital assets

pursuant to the terms of the Asset Sale Agreement.[20]  First, the parties never

signed the Asset Sale Agreement; nor did they ever sign an agreement

incorporating by reference the terms of the Asset Sale Agreement.  Thus, if Count

One alleged the breach of a contract in writing, the claim failed.

Second, treating Count One as alleging, in effect, the breach of an oral

contract, the District Court found no evidence that the parties, after drafting the

---

[20]  In its order granting HMA summary judgment on Count One, the District Court did not state explicitly whether it considered Count One as asserting the breach of a contract in writing or the breach of an oral agreement.  The court's analysis of Count One's allegations, however, indicates that it searched the record for the existence of a written agreement or an oral agreement.

As indicated in part II.A, supra, paragraph 12 of SJH's complaint alleged that the parties "ultimately . . . reached a firm and definitive agreement, as evidenced by writings signed by the parties that contain all of the material terms of the contract for the purchase and sale of the assets of the hospital."  Record, vol. 1, no. 1-2, ¶ 12.  The Notice of Intent and the Asset Sale Agreement were appended to the complaint immediately following that allegation, the implication being that the Asset Sale Agreement was the agreement the parties had reached.  In its brief in opposition to HMA's motion for summary judgment, SJH, in referring to the January 25, 2006, Letter of Intent the parties submitted to the FTC and the DOJ, stated that the "[p]arties did not intend the Letter of Intent to alter the prior agreement reached by them at the time they submitted the Notice [of Intent to the Attorney General]" on December 22, 2005.  Record, vol. 6, no. 116, at 4 (emphasis added).

In its order granting HMA summary judgment on Count One, the District Court reads Count One without differentiating between a contract in writing and an oral agreement, stating that SJH  "maintain[s] that the parties entered into a binding contract to consummate the transaction and that [HMA] was bound, on or before December 22, 2005, when the [Asset Sale Agreement] was submitted to the Attorney General's office for approval."  Record, vol. 3, no. 123, at 14 (emphasis added).  In the next sentence, the court states the following:  "[SJH] posits that by the time [HMA] withdrew from the transaction in February of 2006, the parties had a binding, but unconsummated, contract for the sale of the hospital."  Id. (emphasis added).

In deciding whether summary judgment was appropriate on Count One, we treat SJH as having alleged that the contract referred to in Count One was entered into by the parties (1) on or before December 22, 2005, and before the Attorney General received the Notice of Intent and the unsigned Asset Sale Agreement, or (2) at some time before HMA withdrew from the transaction in February 2006.

15

Asset Sale Agreement, orally agreed to be bound by its terms.  The court discounted altogether SJH's argument that statements HMA made in news and press releases between December 27, 2005, and January 24, 2006, and in the reports filed with the SEC on December 29, 2005, and February 9, 2006, confirmed that the parties had orally agreed to be bound to the terms of the Asset Sale Agreement.  The court considered the statements lacking in probative value because they were "ambiguous."  Record, vol. 3, no. 123, at 14.  Finally, the court found that the Letter of Intent conclusively established that HMA was not contractually bound to purchase the hospital assets.  Although HMA "may have promised that it was interested in acquiring the Hospital," id. at 26, SJH knew, when the parties signed the Letter on January 25, 2006, that HMA would not "be bound [to purchase the facility] until a definitive and binding [Asset Sale Agreement] was finalized and executed."  Id. at 27.

The District Court found no merit in the Count Four promissory estoppel claim on the ground that SJH could not reasonably have relied on HMA's representations that it had negotiated a purchase of the hospital assets.  SJH knew that until the parties signed the Asset Sale Agreement (or a substitute thereof), HMA could back out of the transaction.  The court pointed to a checklist SJH's attorneys prepared for the closing of the transaction, if and when the Attorney General gave the transaction his approval, as evidence of that possibility:  "[T]he

16

'Pre-Closing Checklist' prepared by [SJH's] counsel in January of 2006 include[d] a list of 'Items to be Done Prior to Closing,' which indicate[d] that the [Asset Sale Agreement] still needed '[t]o be executed and delivered after [a] favorable report [is] received from [the] Attorney General.'"  Id. at 28 n.24.

## C.

The District Court entered a final judgment for HMA on Counts One, Two, Four, and Five pursuant to Federal Rule of Civil Procedure 54(b), in accordance with its order granting HMA's motion for summary judgment.  SJH now appeals the judgment on Counts One and Four.[21]  SJH argues, as to Count One, that summary judgment was inappropriate because a jury reasonably could find that the parties intended to be bound by the terms of Asset Sale Agreement, even though they never signed it.  SJH argues alternatively, with respect to Count Four, that a jury reasonably could find HMA estopped to deny that it was obligated to go forward with the acquisition.

---

[21]  SJH includes one line in the "Statement of the Issues" section of its opening brief addressing its claim for attorneys' fees and costs in Count Five:  "Did the District Court err in dismissing [SJH's] claim for attorneys' fees and costs . . . ."  SJH, however, does not bring up Count Five or argue its entitlement to attorneys' fees and costs anywhere else in its brief.  We thus do not address the District Court's summary judgment on Count Five.

III.

In considering SJH's arguments, we take a different path than the one the District Court took.[22]  We start with the historical facts, which are not in dispute.[23]  They consist of the unsigned Asset Sale Agreement; the Acquisition Act and the Notice of Intent submitted to the Georgia Attorney General on December 22, 2005, pursuant to that statute; the HSR Act and the regulations promulgated thereunder; the statements HMA made in its news and press releases and in its filings with the SEC between December 27, 2005, and February 9, 2006; and the statements each party made in the Premerger Notification and attachments it filed with the FTC and the DOJ on January 27, 2006.  With these facts in the forefront, we consider SJH's appeal of the District Court's disposition of Count One and then of Count Four.

A.

1.

Count One incorporates by reference the Asset Sale Agreement.[24]  Articles 2 and 3 of the Asset Sale Agreement, "Representations and Warranties," state that

---

[22]  Because we are reviewing a summary judgment, we consider the historical facts and draw all justifiable inferences in the light most favorable to SJH.  Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 840 (11th Cir. 2000).

[23]  What is in dispute is whether the historical facts yield the inference that, at some point in time, the parties intended to, and did, enter into an agreement containing the terms of the draft Asset Sale Agreement they submitted to the Attorney General on December 22, 2005.

[24]  See Record, vol. 1, no. 1-2, at 46–99; Record, vol. 1, no. 1-3, at 1–16.

the parties "duly and validly executed" the Agreement and that it "constitutes a valid and binding obligation enforceable [against the respective parties] in accordance with its terms." Record, vol. 1, no. 1-2, at 63–64, 72. The Agreement was not executed, though; the parties failed to sign it. Nor did they bind themselves to the terms of the Asset Sale Agreement by executing a separate written agreement that incorporated those terms by reference. The parties did sign an agreement, the Letter of Intent, but it did not incorporate the terms of the Asset Sale Agreement. Rather, as the District Court noted, the Letter made clear that those terms were provisional, that it was the parties' present "'intention to finalize and execute a <u>binding</u> Asset Sale Agreement . . . with those changes (a) which are required by the Attorney General of the State of Georgia . . . (b) which otherwise result from the process set forth in the [Acquisition Act] . . . or (c) which are otherwise agreed upon. . . .'" Record, vol. 3, no. 123, at 15 (citing the Letter of Intent) (emphasis in original).[25]

---

[25] The Letter of Intent is a contract in the sense that it obligated the parties to perform certain functions. At the same time, it declared that neither party was bound to the terms of the Asset Sales Agreement submitted to the Georgia Attorney General on December 22, 2005. Among other things, the Letter's fourth paragraph provides that

> (a) Seller consents to Purchaser making the  necessary filings and/or notifications and (b) Purchaser consents to Seller making the necessary filings and/or notifications, if any, with all governmental agencies or authorities which are required to be made, including, without limitation, pursuant to the [Acquisition Act] or the [HSR Act], in order for Purchaser to acquire the assets as described in the Asset Sale Agreement.

Record, vol. 1, no. 1-5, at 6.

In sum, as a claim for breach of a contract in writing, Count One could not survive summary judgment.[26]  Whether Count One was sustainable on the theory that HMA breached an oral agreement incorporating the terms of the Asset Sale Agreement is another question.  We consider it next.

2.

Although Count One does not explicitly allege that HMA breached an oral agreement, such allegation is implicit.  And SJH's brief on appeal does not disavow it, as a fallback position.[27]  We therefore proceed under the assumption that Count One alleges that HMA breached an oral agreement that incorporated by reference the terms of the Asset Sale Agreement.

SJH faces two hurdles in its attempt to establish the existence of an oral agreement.  First, the record contains no evidence that the parties ever met face-to-

Further, the parties were charged with "cooperat[ing] with each other concerning the Sale Transaction (i) in the preparation and submittal of any filings required pursuant [to] the [Acquisition Act] and (ii) during the course of any public hearings which take place pursuant to the [Acquisition Act]."  Id.

Many obligations contained in the Letter had already been satisfied, at least in part; the parties had made the Notice of Intent filing under the Acquisition Act, and SJH had complied with the Letter's third paragraph by not negotiating with a third party for the sale of its assets. And, after signing the Letter, the parties satisfied their obligation to file the Premerger Notification called for by the HSR Act.

[26] We point out here that SJH's complaint does not assert a claim against HMA for the breach of obligations imposed on it by the Letter of Intent.

[27] Whether a claim that HMA breached an oral promise to purchase the hospital assets—on the terms stipulated in Asset Sale Agreement—would succeed in the face of HMA's statute of frauds defense is highly questionable.  The assets included real estate, and the Georgia statute of frauds, O.C.G.A. § 13-5-30, requires that, to be enforceable, a promise to purchase land must be in writing.  See supra note 17.

face and agreed to be bound by the terms of the Asset Sale Agreement. Second, the Letter of Intent expressly supercedes any agreements the parties previously may have made to that effect. SJH would overcome the first hurdle with the argument that, for summary judgment purposes, the absence of an oral agreement made at a particular point in time is of no moment; a jury reasonably could infer from HMA's post-December 22, 2005, behavior—the statements it made in its press and news releases and in its SEC filings and its preparation of the hospital staff for the change over—that the parties had met and agreed that the transaction would go forward as provided in the Asset Sale Agreement. SJH would overcome the second hurdle by arguing that, notwithstanding Letter of Intent language to the contrary, the parties did not intend that the Letter supercede their agreement to complete the transaction.

SJH presented these arguments to the District Court, together, in three parts of its brief in opposition to HMA's motion for summary judgment (and in support of its motion for summary judgment). It stated the following:

> [T]he Letter of Intent was drafted in order to balance the tension between the [HSR Act's] requirement of a signed writing, and the Georgia Attorney General's procedure stating that the agreement could not be consummated – signed – until after completion of the review process. The facts showing the context in which the parties negotiated the Letter of Intent reveal that the parties did not intend the Letter of Intent to alter the prior agreement reached by them at the time they submitted the Notice [of Intent to the Attorney General].

21

Record, vol. 6, no. 116, at 4 (emphasis added).  Stated another way,

> HMA determined that the parties needed to submit some form of a signed, written agreement to the [DOJ] and the [FTC] in order to comply with the requirements of the [HSR Act].  The [Acquisition Act], however, prevented the parties from consummating their agreement prior to completion of the Attorney General review process.  In an effort not to run afoul of the [Acquisition Act], the parties drafted the [Letter of Intent]. . . .  [It] <u>was drafted for the limited purpose of providing the signed, written agreement required by the [HSR Act]</u>.

Id. at 12–13 (emphasis added).

Responding to HMA's argument that the language of the Letter conclusively established that an agreement in the form of the Asset Sale Agreement would not be finalized and executed until after the Attorney General approved the sale of the hospital assets, SJH repeated this theme:

> HMA seizes upon  mischaracterized language in the [Letter of Intent] to attempt to nullify <u>all of HMA's other words and deeds in connection with the sale of the Hospital</u> . . . .  The "non-binding" language included in the [Letter] was intended by the parties to prevent <u>the [Letter]</u> from prematurely going "too far" by effectively consummating the [Asset Sale Agreement] in violation of the [Acquisition Act], while at the same time, complying with the [HSR Act's] premerger notice requirements.

Id. at 36 (emphasis added).

In short, SJH argues that HMA's words and deeds in connection with the sale of the Hospital—specifically, HMA's press and news releases, the SEC reports it filed, and the steps it took at the hospital to acquaint the staff with its

22

protocols and to prepare for the change over—constituted proof sufficient to enable a jury to infer that HMA and SJH reached a meeting of the minds and thus exchanged promises for the purchase and sale of the hospital assets. And the same evidence would permit the jury to find that the Letter of Intent was not intended to render those promises legally ineffective.

In advancing these arguments, SJH overlooks the Premerger Notifications the parties filed with the FTC and the DOJ two days after they signed the Letter of Intent. These filings describe the transaction the parties anticipated consummating if the Attorney General approved it, and as far as we can tell, they contain the last written statements either party made before HMA abandoned the transaction. The District Court, in its order granting HMA summary judgment, did not consider the Premerger Notifications in its analysis of SJH's claims for relief in Counts One and Four. What the parties said in the Premerger Notifications, though, is highly relevant in determining whether, before submitting the unsigned Asset Sale Agreement to the Georgia Attorney General for his approval, the parties orally agreed to be bound by its terms.

The HSR Act required the parties to notify the FTC and the DOJ of the transaction they planned to consummate because the assets involved exceeded $50 million in value.[28] They provided such notice on January 27, 2006, after signing

---

[28] See supra note 9 and accompanying text.

23

the Letter of Intent.  According to the regulation governing the filing of a

Premerger Notification, the "notification [had to] contain an affidavit, attached to

the front of the notification, attesting that a contract, agreement in principle or

letter of intent to . . . acquire has been executed, and further attesting to the good

faith intention of the person filing the notification to complete the transaction."[29]

The Premerger Notification form that each party filed contained a heading,

"DESCRIPTION OF ACQUISITION."  Under the heading in the form it filed,

SJH stated, in pertinent part, the following:

> Pursuant to a Letter of Intent, executed on January 26, 2006 (Exhibit
> 3(d)(1) at Tab 1), [HMA] will acquire the assets of [SJH].  The Letter
> of Intent represents the parties' intention to execute a binding Asset
> Sale Agreement (attached hereto as Exhibit 3(d)(2) at Tab 2), which
> is pending review and approval by the Attorney General of the State
> of Georgia pursuant to the [Acquisition Act].  HMA will pay
> $75,000,000 in cash (subject to adjustment) in consideration for the
> assets.
>
> . . . .
>
> This transaction is conditioned upon, among other things:  (1) the
> expiration or early termination of any applicable waiting period under
> the Hart-Scot-Rodino Antitrust Improvement Act of 1976; (2) the

---

[29]  Section 803.5 of Title 16 of the Code of Federal Regulation, titled "Affidavits required," states in pertinent part:

> (b). . . [T]he notification required by the act shall contain an affidavit, attached to
> the front of the notification, attesting that a contract, agreement in principle or
> letter of intent to . . . acquire has been executed, and further attesting to the good
> faith intention of the person filing notification to complete the transaction.

16 C.F.R. § 803.5 (2012).

receipt of all required governmental authorizations from all applicable governmental entities; and (3) other customary conditions to closing.  The parties intend to close this transaction as soon as practicable after the expiration of early termination of the waiting period under the Hart-Scott-Rodino Act and the satisfaction and/or waiver of all the other conditions to closing.

Record, vol. 4, no. 103, Ex. 210, at 5.

In the form it filed, HMA stated under the same heading the following, in

pertinent part:

> Pursuant to the Letter of Intent, executed on January 25, 2006, [HMA] intends to acquire the assets of [SJH].  HMA will pay $75,000,000 in cash (subject to adjustment) in consideration for the assets.
>
> . . . .
>
> This transaction is conditioned upon, among other things:  (1) execution of a definitive agreement; (2) the expiration or early termination of any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976; (3) the receipt of all required governmental authorizations from all applicable governmental entities; and (4) other customary conditions to closing that will be contained in the definitive agreement.  The parties intend to close this transaction as soon as practicable after the expiration or early termination of the waiting period under the Hart-Scott-Rodino Act and satisfaction and/or waiver of all the other conditions to closing.

Record, vol. 4, no. 103, Ex. 288, at 6.

Under the heading "SUBMIT A COPY OF THE MOST RECENT

VERSION OR AGREEMENT (or letter of intent to . . . acquire)," both parties

cited to, and provided copies of, the Letter of Intent and the unsigned Asset Sale

25

Agreement. Record, vol. 4, no. 103, Ex. 210, at 7; Record, vol. 4., no. 103, Ex. 288, at 8.

We assume that the parties prepared and filed the Premerger Notifications after reading the following FTC interpretation of the HSR Act's requirements, as amplified by the rules promulgated pursuant to the Act:[30]

> The act requires the parties to certain acquisitions of . . . assets to notify the FTC and the DOJ and to wait a specified period of time before consummating the transaction.  The purpose of the act and the rules is to ensure that such transactions receive meaningful scrutiny under the antitrust laws, with the possibility of an effective remedy for violations, before consummation.
>
> . . . .
>
> Section 803.5(b) requires that " * * * (f) . . . the notification required by the act shall contain an affidavit * * * attesting that a contract, agreement in principal or letter of intent to . . . acquire has been executed, and * * * to the good faith intention of the person filing notification to complete the transaction."  Section 803.6(a) of the rules states that "The notification required by the act shall be certified * * *."
>
> One of the primary purposes of these requirements—particularly that of certification—is to preserve the evidentiary value of the filing.

---

[30]  See 15 U.S.C. § 18a(d), titled "Commission rules":

The [FTC], with the concurrence of the Assistant Attorney General and by rule in accordance with [the Administrative Procedure Act, 5 U.S.C. § 553 (2006)], consistent with the purposes of this section --

> (1) shall require that the notification required under subsection (a) of this section be in such form and contain such documentary material and information relevant to a proposed acquisition as is necessary and appropriate to enable the [FTC] and the Assistant Attorney General to determine whether such acquisition may, if consummated, violate the antitrust laws . . . .

> The Statement of Basis and Purpose . . . for § 803.6 states that '' * * * the certification is intended to estop the person on whose behalf the report is filed from later denying the completeness or accuracy of the information provided on the form in the event that either enforcement agency seeks to introduce any such information into evidence in any proceeding.'' 43 FR 33511 (July 31, 1978). The certification requirement is also intended to place responsibility on an individual to ensure that information reported is true, correct, and complete and that the form is filled out in accordance with the act and the rules. Id.
>
> The affidavit requirement is intended to ensure that several important prerequisites are met before the review process begins. . . . In consensual transactions, the parties must . . . attest that a contract, letter of intent, or agreement in principal has been executed. Id. Its contents also ensure that the parties intend to consummate the acquisition and are not using the notification process to vet a purely hypothetical transaction with the agencies. Id. at 33511.

64 Fed. Reg. 51764 (Sept. 24, 1999) (emphasis added).[31]

The Premerger Notifications are certified under penalty of perjury. Section 1001 of Title 18 of the United States Code makes it a felony to, among other things, make a "materially false . . . statement or representation" "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States."[32] The statements the parties made in the Premerger Notifications

---

[31] The word "person" includes entities such as SJH and HMA. See 16 C.F.R. § 801.1 (2012).

[32] The text of 18 U.S.C. § 1001 (2006) reads, in pertinent part:

(a) . . . whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully --

    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement or

constitute statements or representations in a matter within the jurisdiction of the executive branch.

The record contains no evidence to the effect that the parties failed to comply with the HSR Act and the implementing regulations; the information they provided the FTC and the DOJ about their contractual relationship, as depicted in the Letter of Intent, was complete and accurate. As stated in the Letter, it was their "intention to finalize and execute a binding Asset Sale Agreement in the . . . form attached to th[e] Letter of Intent." Record, vol. 1, no. 1-5, at 5. After reading these words and assuming that the parties filed the Premerger Notifications intending to complete the transaction, the FTC and the DOJ would assume that if the Georgia Attorney General approved the transaction as depicted in the Agreement, the transaction would close.

By filing the Premerger Notifications, the parties represented the following as true: (1) the Asset Sale Agreement would not become a binding, enforceable contract until signed by the parties; (2) the Letter of Intent superceded any agreements—whether written or oral—that may have existed between the parties regarding HMA's acquisition of the hospital assets; (3) the parties had a good faith

---

representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years . . . .

28

intention to complete the transaction and were not using the notification process to vet a purely hypothetical transaction with the agencies.  To this end, the parties were obligated to attend the hearing the Georgia Attorney General had scheduled for February 13, 2006, and to cooperate with each other in presenting the case for HMA's acquisition.[33]

In light of the foregoing, we find no error in the District Court decision to grant HMA summary judgment on Count One.

SJH is nonetheless convinced that HMA should be held to account in damages for representing to the public over a considerable period of time that it was acquiring the hospital assets and for inducing SJH to change its position in reliance on such representation.  SJH states its case for damages on that theory in Count Four, to which we now turn.

### B.

SJH contends that a jury, once informed of HMA's conduct after it joined SJH in seeking the Attorney General's approval of the transaction, could reasonably find HMA estopped to deny that it was obligated to purchase the hospital assets on the terms set out in the Agreement.  For, in addition to announcing to the public on six occasions—via news and press releases and SEC

---

[33] SJH does not seek in Count One to recover damages for HMA's breach of its Letter of Intent obligation to attend the hearing and join SJH in urging the Attorney General to approve the acquisition.

filings—that it had "negotiated an agreement" to acquire the 231-bed St. Joseph Hospital, HMA took several steps toward completing the acquisition.  HMA met with the hospital staff, held training sessions for the purpose of acquainting the staff with HMA protocols and the operation of its computer system, which it installed, and applied to have licenses transferred from SJH to HMA.

A jury, as lay persons, might be persuaded to hold HMA accountable for engaging in such conduct.  The proper application of the doctrine of promissory estoppel to this record, however, would mean that the jury would not decide the claim.

Promissory estoppel is codified in Georgia as O.C.G.A. § 13–3–44(a), which reads as follows:

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

O.C.G.A. § 13–3–44(a) (2012).

The District Court read SJH's Count Four claim as follows:

> [SJH] assert[s] that "HMA promised to purchase the assets of [SJH] and reasonably expected to and did induce [SJH] to rely on its promise." (Comp. ¶ 36.)  More specifically, [SJH] allege[s] that [it] "reasonably relied on HMA's repeated promises and public statements that HMA agreed to purchase the Assets of [SJH]," and "injustice may be avoided only by enforcing the promise made . . . by HMA to purchase" the Hospital.  (Id. ¶¶ 37, 40.)

Record, vol. 3, no. 123, at 25.

The court held that the claim failed because the Letter of Intent "clearly reflects the parties' intentions not to be bound until a definitive and binding [Asset Sale Agreement] was finalized and executed." Id. at 27. We agree. The Letter of Intent coupled with SJH's representation in the Premerger Notification filed with the FTC and the DOJ—that the parties would not execute a "binding Asset Sale Agreement" until the Georgia Attorney General approved it—establishes as a matter of law that SJH could not reasonably rely on HMA's "promise" to purchase its hospital assets.

IV.

For the reasons stated above, we find no reason for disturbing the District Court's judgment on Counts One and Four of SJH's complaint. The judgment is, accordingly,

AFFIRMED.